Donald WELCH, Anthony Duk,
Aaron Bitzer, Plaintiffs,

v.

Edmund G. BROWN, Jr., Governor of
the State of California, In His Official
Capacity, Anna M. Caballero, Secre-
tary of California State and Consumer
Services Agency, In Her Official Ca-
pacity, Denise Brown, Director of
Consumer Affairs, In Her Official Ca-
pacity, Christine Wietlisbach, Patricia
Lock–Dawson, Samara Ashley, Harry
Douglas, Julia Johnson, Sarita Kohli,
Renee Lonner, Karen Pines, Christina
Wong, In Their Official Capacities as
Members of the California Board of
Behavioral Sciences, Sharon Levine,
Michael Bishop, Silvia Diego, Dev
Gnanadev, Reginald Low, Denise
Pines, Janet Salomonson, Gerrie
Schipske, David Serrano Sewell, Bar-
bara Yaroslaysky, In Their Official
Capacities as Members of the Medical
Board of California, Defendants.

No. CIV. 2:12–2484 WBS KJN.

United States District Court,
E.D. California.

Dec. 3, 2012.

Kevin Trent Snider, Matthew Brown McReynolds, Sacramento, CA, Michael John Peffer, Santa Ana, CA, for Plaintiffs.

Alexandra Robert Gordon, Paul Evan Stein, California Office of the Attorney General San Francisco San Francisco, CA, for Defendants.

*MEMORANDUM AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION*

WILLIAM B. SHUBB, District Judge.

Plaintiffs Donald Welch, Anthony Duk, and Aaron Bitzer seek to enjoin enforcement of Senate Bill 1172 ("SB 1172"), which if it goes into effect on January 1, 2013, will prohibit mental health providers from engaging in sexual orientation change efforts ("SOCE") with minors.

Because the court finds that SB 1172 is subject to strict scrutiny and is unlikely to satisfy this standard, the court finds that plaintiffs are likely to succeed on the merits of their 42 U.S.C. § 1983 claims based on violations of their rights to freedom of speech under the First Amendment. Because plaintiffs have also shown that they are likely to suffer irreparable harm in the absence of an injunction, that the balance of equities tips in their favor, and that an injunction is in the public interest, the court grants plaintiffs' motion for a preliminary injunction.[1]

I. *Factual and Procedural Background*

On September 29, 2013, defendant Governor Edmund G. Brown, Jr., signed SB 1172. SB 1172 prohibits a "mental health provider" from engaging in "sexual orientation change efforts with a patient under 18 years of age" under all circumstances. Cal. Stats.2012, ch. 835, at 91 ("SB 1172") (to be codified at Cal. Bus. & Prof.Code §§ 865(a), 865.1). It further provides that "[a]ny sexual orientation change efforts attempted on a patient under 18 years of age by a mental health provider shall be considered unprofessional conduct and shall subject a mental health provider to disci-

---

1. The court accordingly does not reach plaintiffs' remaining constitutional challenges, namely, that SB 1172 violates any rights to privacy, violates the First Amendment Free Exercise and Establishment Clauses, or is unconstitutionally vague and overbroad under the First Amendment.

pline by the licensing entity for that mental health provider." *Id.* (to be codified at Cal. Bus. & Prof.Code § 865.2).

SB 1172 defines "sexual orientation change efforts" as "any practices by mental health providers that seek to change an individual's sexual orientation. This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." *Id.* (to be codified at Cal. Bus. & Prof.Code § 865(b)(1)). From this definition, SB 1172 excludes "psychotherapies that: (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation." *Id.* (to be codified at Cal. Bus. & Prof.Code § 865(b)(2)). The bill defines "mental health provider" as:

> a physician and surgeon specializing in the practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a licensed educational psychologist, a credentialed school psychologist, a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee, or any other person designated as a mental health professional under California law or regulation.

*Id.* (to be codified at Cal. Bus. & Prof.Code § 865(a)).

Plaintiff Donald Welch is a licensed marriage and family therapist in California and an ordained minister. (Welch Decl. ¶ 1 (Docket No. 11).) He is currently the president of a non-profit professional counseling center, the owner and director of a for-profit counseling center, and an adjunct professor at two universities. (*Id.* ¶ 4.) Welch is also employed part-time as a Counseling Pastor for Skyline Wesleyan Church, which teaches that "human sexuality . . . is to be expressed only in a monogamous lifelong relationship between one man and one woman within the framework of marriage." (*Id.* ¶ 5, Ex. A at 3.) Welch provides treatment that qualifies as SOCE under SB 1172 and his "compliance with SB 1172 will jeopardize [his] employment" at Skyline Wesleyan Church. (*Id.* ¶¶ 5, 8–9, 11, 17.)

Plaintiff Anthony Duk is a medical doctor and board certified psychiatrist in full-time private practice who works with adults and children over the age of sixteen. (Duk Decl. ¶ 1 (Docket No. 13).) His current patients include minors "struggling with" homosexuality and bisexuality. (*Id.* ¶ 6.) In his practice, Duk utilizes treatment that qualifies as SOCE under SB 1172. (*Id.*)

Plaintiff Aaron Bitzer is an adult who has had same-sex attractions beginning in his childhood and was "involved in sexual orientation efforts commonly called 'SOCE'" as an adult in 2011 and 2012. (Bitzer Decl. ¶¶ 1–11, 15 (Docket No. 12).) Bitzer "had been planning on becoming a therapist specifically to work" with individuals having same-sex attractions and to help men like himself. (*Id.* ¶ 26.) He explains that, "[b]ecause of SB 1172, [he has] had to reorder all of [his] career plans and [is] trying to pursue a doctorate so as to also contribute research to this field." [2] (*Id.*)

On October 1, 2012, plaintiffs initiated this action under 42 U.S.C. § 1983 against

---

**2.** Neither defendants nor amicus challenged whether Bitzer has Article III standing.

various state defendants to challenge the constitutionality of SB 1172. (*See* Docket No. 1.) In their Complaint, plaintiffs seek declaratory relief and preliminary and permanent injunctions. Presently before the court is plaintiffs' motion for a preliminary injunction in which they seek to enjoin enforcement of SB 1172 before the new law goes into effect on January 1, 2013.[3] The court granted Equality Justice permission to submit briefs and present oral argument as an amicus curiae in this case. (*See* Docket No. 30.)

## II. *Analysis*

■ To succeed on a motion for a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir.2011). The Supreme Court has repeatedly emphasized that "injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S.Ct. 365.

■ "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). " 'A preliminary injunction ... is not a preliminary adjudication on the merits but rather a

device for preserving the status quo and preventing the irreparable loss of rights before judgment.' " *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir.2010) (quoting *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984)) (omission in original).

### A. *Plaintiffs May Not Assert the Rights of Parents and Minors*

■ "As a prudential matter, even when a plaintiff has Article III standing, [federal courts] do not allow third parties to litigate on the basis of the rights of others." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 917 (9th Cir.2004). The Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ This limitation on prudential standing is not "absolute," and the Court has recognized "that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Id.* at 129–30, 125 S.Ct. 564. Specifically, a litigant may bring an action on behalf of a third party if "three important criteria are satisfied": "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must

---

**3.** Defendants submitted numerous evidentiary objections to the declarations of Duk, Welch, and Bitzer "to the extent that they are offered as scientific opinion evidence on the efficacy or safety of [SOCE] generally, or on minors in particular, or on the nature and/or causes of homosexuality, bisexuality, or heterosexuality." (*See* Docket No. 37.) The court neither

considers nor relies on these declarations for such purposes and discusses plaintiffs' statements in the declarations only to provide background information and to identify how Duk and Welch perform SOCE. The court therefore need not resolve defendants' evidentiary objections.

exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *accord Coalition of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002).

Third-party standing for physicians asserting the rights of their patients first developed in the abortion context. For example, in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court concluded that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." [4] *Singleton*, 428 U.S. at 118, 96 S.Ct. 2868 (plurality opinion); *see also Planned Parenthood of Idaho, Inc.*, 376 F.3d at 917 ("Since at least *Singleton v. Wulff*, [ ] it has been held repeatedly that physicians may acquire jus tertii standing to assert their patients' due process rights in facial challenges to abortion laws.").

Even assuming plaintiffs can satisfy the first two criteria, plaintiffs cannot credibly suggest that parents of minor children who seek SOCE and minors who desire SOCE face a hindrance in asserting their own rights. Three days after plaintiffs initiated this action, a second case challenging SB 1172 was filed in this court. The plaintiffs in that case include parents of minor children seeking SOCE for their minor children and minor children seeking SOCE, and the plaintiffs in that case have similarly sought a preliminary injunction. (*See Pickup v. Brown*, Civ. No. 2:12–2497 KJM EFB (E.D.Cal.) Compl. ¶¶ 2–6 (Docket No. 1).)

Not only is it clear that parents and minors do not face a hindrance in challenging SB 1172 as it relates to their rights, determining whether the statute will violate their rights is more appropriately addressed in the case in which they are plaintiffs. Accordingly, plaintiffs in this case may not assert the third-party rights of parents of minor children or minors and the court's analysis of SB 1172 will be limited to challenges based on plaintiffs' own rights. *Cf. Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208–09 (6th Cir.2011) (finding that teachers lacked prudential standing to assert the rights of their students when, even though the teachers had a sufficiently close relationship to their students, "[t]here is no evidence that the students or their parents might be deterred from suing," "that the claims of the students would be imminently moot," or "that the students face systemic practical challenges to filing suit").

---

**4.** Only three justices joined in Justice Blackmun's rationale as to why the physicians could assert the rights of their patients. *Singleton*, 428 U.S. at 108, 96 S.Ct. 2868 (plurality opinion). Justice Stevens, the fifth vote in the outcome, concluded that the doctors had standing because they "have a financial stake in the outcome of the litigation" and "claim that the statute impairs their own constitutional rights." *Singleton*, 428 U.S. at 121, 96 S.Ct. 2868 (Stevens, J., concurring in part). Despite only three justices having joined Justice Blackmun's analysis, "[m]any cases nonetheless speak of the court in *Singleton* as having 'held' that the physician had third-party standing." *Aid for Women v. Foulston*, 441 F.3d 1101, 1113 n. 13 (10th Cir.2006); *see also Singleton*, 428 U.S. at 122, 96 S.Ct. 2868 (Powell, J., dissenting) ("The Court further holds that ... respondents may assert, in addition to their own rights, the constitutional rights of their patients .... I dissent from this holding.").

In *Singleton*, the physicians had alleged that the statute at issue violated their "constitutional rights to practice medicine." *Singleton*, 428 U.S. at 113, 96 S.Ct. 2868 (internal quotation marks and citation omitted). Justice Brennan stated that the Court had "no occasion to decide whether such a right exists." *Id.*

### B. *Plaintiffs' Right of Free Speech under the First Amendment*

■ "The First Amendment applies to state laws and regulations through the Due Process Clause of the Fourteenth Amendment." *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1053 (9th Cir.2000) (hereinafter *"NAAP"*). "The Supreme Court has recognized that physician speech is entitled to First Amendment protection because of the significance of the doctor-patient relationship." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir.2002) (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion); *Rust v. Sullivan*, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). The Ninth Circuit has also "recognized that communication that occurs during psychoanalysis is entitled to First Amendment protection." *Conant*, 309 F.3d at 637.

1. *Because SB 1172 Would Restrict the Content of Speech and Prohibit the Expression of Particular Viewpoints It Is Subject to Strict Scrutiny Review*

 a. *The Fact that SB 1172 Is a Professional Regulation Does Not Exempt It from Strict Scrutiny*

Defendants and amicus first argue that, even though physician speech receives First Amendment protection, SB 1172 is subject only to rational basis or a reasonableness level of review because it is a regulation of professional conduct. In a concurring opinion in *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), Justice White, joined by two other justices, stated that "[r]egulations on entry into a profession, as a general matter, are constitutional if they 'have a rational connection with the applicant's fitness or capacity to practice' the profession." *Lowe*, 472 U.S. at 228, 105 S.Ct. 2557 (White, J., concurring) (quoting *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)). Relying on *Lowe*, the Fourth Circuit held that "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir.1988) (internal quotation marks and citation omitted).[5]

In a brief paragraph of the plurality decision in *Casey*, Justice O'Connor, with little analysis and joined by only two justices, addressed plaintiffs' "asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State." *Casey*, 505 U.S. at 884, 112 S.Ct. 2791 (plurality opinion). Justice O'Connor rejected this claim, stating, "To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.* (internal citation omitted).

In *Lowe*, Justice White recognized that, "[a]t some point, a measure is no longer a

---

5. In *Dittman v. California*, 191 F.3d 1020 (9th Cir.1999), the Ninth Circuit rejected the plaintiff's substantive due process challenge to a regulation requiring disclosure of his social security number to renew his acupuncturist license. In doing so, the court quoted *Lowe* for "the fundamental principle that '[r]egulations on entry into a profession, as a general matter, are constitutional if they "have a rational connection with the applicant's fitness or capacity to practice" the profession.'" *Dittman*, 191 F.3d at 1030 (quoting *Lowe*, 472 U.S. at 228, 105 S.Ct. 2557). Unlike *Lowe* and *Dittman*, SB 1172 is not a regulation "on entry into a profession," *Lowe*, 472 U.S. at 228, 105 S.Ct. 2557.

regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment." *Lowe*, 472 U.S. at 230, 105 S.Ct. 2557 (White, J., concurring). The Ninth Circuit has also stated that the plurality opinion in *Casey* "did not uphold restrictions on speech itself." *Conant*, 309 F.3d at 638. The lower levels of review contemplated in *Lowe* and *Casey* thus do not appear to apply if a law imposes restrictions on a professional's speech. Some courts have nonetheless applied a lower level of review to professional regulations addressing the speech of a professional. *See, e.g., Shultz v. Wells*, Civ. No. 2:09–646, 2010 WL 1141452, at *9–10 (M.D.Ala. Mar. 3, 2010) (upholding discipline of licensed chiropractor who advised patient to stop taking prescriptions as a reasonable regulation of speech in the doctor-patient relationship); *see generally Wollschlaeger v.*

*Farmer*, 880 F.Supp.2d 1251, 1262–64 (S.D.Fla.2012).[6]

The Ninth Circuit, however, has explained that a content- or viewpoint-based professional regulation is subject to strict scrutiny. In *NAAP*, the Ninth Circuit held that California's mental health licensing laws, which prohibited the plaintiffs from practicing psychoanalysis in California, did not violate the First Amendment. *NAAP*, 228 F.3d at 1056. Assuming that the licensing scheme implicated speech,[7] the Ninth Circuit rejected the plaintiffs' argument that · psychoanalysis deserved unique First Amendment protection because it is the "talking cure." *Id.* at 1054. The court agreed with the district court's conclusion that "the key component of psychoanalysis is the treatment of emotional suffering and depression, not speech.... That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amend-

---

**6.** In *Wollschlaeger*, the Southern District of Florida cites *Conant* as requiring that professional regulations "must have the requisite 'narrow specificity.'" *Wollschlaeger*, 880 F.Supp.2d at 1263 (quoting *Conant*, 309 F.3d at 639). The Ninth Circuit's reference to "narrow specificity" derives from Supreme Court jurisprudence addressing vagueness, and the court ultimately upheld the injunction against the federal policy because "the government has been unable to articulate exactly what speech is proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana." *Conant*, 309 F.3d at 639.

In *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), which the Ninth Circuit cited as authority for the "narrow specificity" standard, the Supreme Court addressed an allegedly vague statute and concluded, "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433, 83 S.Ct. 328 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 311, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)); *see also Cantwell*, 310 U.S. at 311, 60 S.Ct. 900 ("[I]n the absence of a statute narrowly

drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.").

**7.** The Ninth Circuit did not determine whether First Amendment rights to speech were in fact implicated by the challenged licensing scheme. *See NAAP*, 228 F.3d at 1053 ("We conclude that, *even if a speech interest is implicated*, California's licensing scheme passes First Amendment scrutiny.") (emphasis added); *id.* at 1056 ("*Although some speech interest may be implicated*, California's content-neutral mental health licensing scheme is a valid exercise of its police power to protect the health and safety of its citizens and does not offend the First Amendment.") (emphasis added). Two years later in *Conant*, however, the Ninth Circuit stated that, in *NAAP*, "we recognized that communication that occurs during psychoanalysis is entitled to First Amendment protection." *Conant*, 309 F.3d at 637.

ment protection." *Id.* (internal quotation marks omitted). The Ninth Circuit then explained that "[t]he communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.* at 1054–55.

After concluding that "the licensing scheme is a valid exercise of California's police power," the Ninth Circuit held that it was not subject to strict scrutiny because it was content- and viewpoint-neutral. *Id.* at 1055. The court specifically stated, "We have held that ' "[t]he appropriate level of scrutiny is tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." ' " *Id.* (quoting *Black v. Arthur*, 201 F.3d 1120, 1123 (9th Cir.2000)) (alteration in original). The court neither suggested nor held that a lower standard governed California's mental health licensing laws regardless of content simply because they were professional regulations. *See id.* at 1055 (emphasizing that, "[a]lthough the California laws and regulations may require certain training, speech is not being suppressed based on its message"). It therefore follows under *NAAP* that a professional regulation would be subject to strict scrutiny if it is not content- and viewpoint-neutral.

■ Since *NAAP*, the Ninth Circuit has continued to adhere to the traditional standards governing content- or viewpoint-based regulations. In finding that a federal policy prohibiting physicians from recommending marijuana to patients violated the First Amendment, the Ninth Circuit recognized that "[b]eing a member of a regulated profession does not, as the government suggests, result in a surrender of First Amendment rights" and found that the federal policy was content- and viewpoint-based. *Conant*, 309 F.3d at 637. The *Conant* court explained how the constitutional regulations in *NAAP* were content-neutral, *id.* at 637, and emphasized

that "content-based restrictions on speech are 'presumptively invalid.' " *Id.* at 637–38. In 2008, the Ninth Circuit cited *NAAP* as authority for the rule that "both viewpoint-based and content-based speech restrictions trigger strict scrutiny." *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 431 (9th Cir.2008). Accordingly, even if SB 1172 is viewed as a professional regulation, it is subject to strict scrutiny if it is content- or viewpoint-based.

**b. *SB 1172 Is Not Exempt from Strict Scrutiny Review as a Statute Regulating Conduct***

Defendants and amicus next contend that 1) SB 1172 is not subject to review under the First Amendment because it regulates conduct, not speech; and 2) even if SB 1172 is subject to First Amendment review, it is reviewed under intermediate scrutiny. Under Supreme Court First Amendment jurisprudence, " 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 604, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (Stevens, J., concurring) ("This Court has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression.").

SB 1172 defines SOCE as "any practices by mental health providers that seek to change an individual's sexual orientation. This includes efforts to change behaviors

or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." SB 1172 (to be codified at Cal. Bus. & Prof.Code § 865(b)(1)). A review of the bill analyses leading up to the passage of SB 1172 illustrates that there is not a single method of performing SOCE. For example, a Senate Judiciary Committee bill analysis explains that "SOCE techniques may include aversive treatments such as electric shock or nausea inducing drugs administered simultaneously with the presentation of homoerotic stimuli. Practitioners may also try to alter a patient's sexuality with visualization, social skills training, psychoanalytic therapy, and spiritual interventions." S. Judiciary Comm., Comm. Analysis of SB 1172, at 3 (May 8, 2012). Joseph Nicolosi, "one of the founders of modern reparative therapy," promotes SOCE intervention plans that "involve conditioning a man to a traditional masculine gender role via participation in sports activities, avoidance of the other sex unless for romantic contact, avoiding contact with homosexuals, increasing time spent with heterosexuals, engaging in group therapy, marrying a person of the opposite sex and fathering children." S. Comm. on Bus., Professions & Econ. Dev., Comm. Analysis of SB 1172, at 8 (Apr. 19, 2012). "Others, particularly conservative Christian transformational ministries, use the term conversion therapy to refer to the utilization of prayer, religious conversion, individual and group counseling to change a person's sexual orientation." *Id.*

In the 2009 "Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation" ("2009 APA Report"), the array of treatments used in SOCE, many of which do not include speech, are described as follows:

> Behavior therapists tried a variety of aversion treatments, such as inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts. Other examples of aversive behavioral treatments included covert sensitization, shame aversion, systematic desensitization, orgasmic reconditioning, and satration therapy. Some nonaversive treatments used an educational process of dating skills, assertiveness, and affection training with physical and social reinforcement to increase other-sex sexual behaviors. Cognitive therapists attempted to change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation.

(Stein Decl. Ex. 1 ("2009 APA Report") at 22 (Docket No. 34–1).)

From the myriad of explanations about the various SOCE treatments, it is clear that there is not a single method for a mental health provider to engage in SOCE. The Ninth Circuit has also recognized that "the key component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech." *NAAP*, 228 F.3d at 1054 (internal quotation marks omitted). Nonetheless, at least some forms of SOCE, such as "talk therapy," involve speech and the Ninth Circuit has stated that the "communication that occurs during psychoanalysis is entitled to First Amendment protection." *Conant*, 309 F.3d at 637. Therefore, even if SB 1172 is characterized as primarily aimed at regulating conduct, it also extends to forms of SOCE that utilize speech and, at a minimum, regulates conduct that has an incidental effect on speech.

In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court explained that,

"when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673. In such circumstances, "a government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. 1673.

In *O'Brien,* the Court rejected a First Amendment free speech challenge to a law criminalizing the knowing destruction of draft registration certificates when O'Brien claimed he burned his certificate as a demonstration against the war. After concluding that the law satisfied the four-part test, the Court reasoned that "[t]he case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." *Id.* at 382, 88 S.Ct. 1673. The intermediate scrutiny standard from *O'Brien* therefore "does not provide the applicable standard for reviewing a content-based regulation of speech." *Holder v. Humanitarian Law Project,* — U.S. —, 130 S.Ct. 2705, 2723, 177 L.Ed.2d 355 (2010).

In *Humanitarian Law Project,* the Supreme Court addressed a preenforcement challenge to the federal material-support statute and held that it could not be assessed under the *O'Brien* test. The material-support statute "makes it a federal crime to 'knowingly provid[e] material support or resources to a foreign terrorist organization.'" *Id.* at 2713 (quoting 18 U.S.C. § 2339B). The Court recognized that the "material support" the statute prohibited "most often does not take the form of speech at all," but that the plaintiffs in the case intended to provide material support through speech. *Id.* at 2723. After concluding that the statute was content-based and therefore subject to strict scrutiny, the Court rejected the government's argument that it should nonetheless be subject to intermediate scrutiny "because it *generally* functions as a regulation of conduct." *Id.* at 2724. In rejecting the government's position, the Court emphasized, "The law here may be described as directed at conduct, . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message" because the plaintiffs intended to "provide material support to the PKK and LTTE in the form of speech." *Id.*

Similar to *Humanitarian Law Project,* plaintiffs in this case have indicated that they wish to engage in SOCE through speech. Moreover, even if the court assumes that most SOCE is performed through conduct and that SOCE generally functions to regulate conduct, it is not automatically subject to review under the *O'Brien* test. As the Court made clear in *O'Brien* and has repeatedly confirmed since that decision, a law regulating conduct that incidentally affects speech is subject to strict scrutiny if it is content or viewpoint-based. Accordingly, even assuming SB 1172 is properly characterized as a statute regulating conduct, because it has at least an incidental effect on speech and plaintiffs intend to engage in SOCE through speech, intermediate scrutiny applies only if SB 1172 is content- and viewpoint-neutral.

c. *SB 1172 Lacks Content and Viewpoint Neutrality*

Because SB 1172 cannot be reviewed under a lower level of review as a

professional regulation or a regulation of conduct if it is content- or viewpoint-based, the court must assess its neutrality to determine the appropriate level of review. "The principal inquiry in determining whether a regulation is content-neutral or content-based is whether the government has adopted [the] regulation ... because of [agreement or] disagreement with the message it conveys." *NAAP*, 228 F.3d at 1055 (internal quotation marks omitted) (alterations and omission in original); *accord Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 642, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir.2009) ("A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment."). "Viewpoint discrimination is [ ] an egregious form of content discrimination" and occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

In *Conant*, the Ninth Circuit relied on the First Amendment to uphold a permanent injunction enjoining the federal government from revoking a physician's license to prescribe controlled substances or initiating an investigation of the physician on the sole ground that the physician recommended medical marijuana to a patient. *Conant*, 309 F.3d at 631. The Ninth Circuit emphasized that "[t]he government's policy ... seeks to punish physicians on the basis of the content of doctor-patient communications" because "[o]nly doctor-patient conversations that include discussions of the medical use of marijuana trig-

ger the policy." *Id.* at 637. The court further explained that "the policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient." *Id.* at 639; *cf. Rust*, 500 U.S. at 200, 111 S.Ct. 1759 (explaining that the challenged regulations "do not significantly impinge upon the doctor-patient relationship" in violation of the First Amendment because they do not "require[ ] a doctor to represent as his own any opinion that he does not in fact hold").

Defendants argue that SB 1172 is distinguishable from *Conant* because it does not extend as far as the challenged federal policy against a physician recommending marijuana for a patient. SB 1172's ban is limited to prohibiting mental health providers from engaging in SOCE with minor patients. SB 1172 (to be codified at Cal Bus. & Prof.Code § 865.1). The bill defines SOCE as "any practices by mental health providers that seek to change an individual's sexual orientation[, including] ... efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." *Id.* (to be codified at Cal. Bus. & Prof.Code § 865(b)(1)).

Based on SB 1172's definition of SOCE, defendants argue that the new law would not preclude a mental health provider from expressing his or her views to a minor patient that the minor's sexual orientation could be changed, informing a minor about SOCE, recommending that a minor pursue SOCE, providing a minor with contact information for an individual who could perform SOCE, or sharing his or her views about the morality of homosexuality.[8] As-

---

**8.** Plaintiffs disagree, arguing that such statements would come with SB 1172's prohibition because such statements could be viewed as seeking to change a patient's sexual orientation.

suming defendants' interpretation is correct, SB 1172 would still allow mental health providers to exercise their medical judgment to recommend SOCE, *see Conant,* 309 F.3d at 638, and would preclude them only from providing a minor with SOCE.

This distinction, however, addresses only whether SB 1172 is viewpoint-based. The Ninth Circuit's analysis in *NAAP* and Supreme Court precedent render it difficult to conclude that SB 1172 is content-neutral simply because it is limited to prohibiting SOCE. In *NAAP,* the Ninth Circuit concluded that the challenged licensing laws were content-neutral because "they do not dictate what can be said between psychologists and patients during treatment" or "the content of what is said in therapy" and "[n]othing in the statutes prevents licensed therapists from utilizing psychoanalytical methods." *NAAP,* 228 F.3d at 1055–56. The court emphasized that "speech is not being suppressed based on its message" and that the scheme "was not adopted because of any disagreement with psychoanalytical theories." *Id.*

*Humanitarian Law Project,* in which the Supreme Court held that the material support statute was content-based and therefore subject to strict scrutiny, provides further guidance. In that case, the Court recognized that the statute did not "suppress ideas or opinions in the form of 'pure political speech'" because plaintiffs could "say anything they wish on any topic" and independently advocate for or join one of the terrorists organizations. *Humanitarian Law Project,* 130 S.Ct. at 2722–23. Nonetheless, the court concluded that the statute "regulates speech on the basis of its content" because whether the plaintiffs' speech to a foreign terrorist organization would be barred by the statute depended on what the plaintiffs said. *See id.* at 2723–24.

Under *NAAP* and *Humanitarian Law Project,* the fact that SB 1172 may allow mental health providers to "say anything they wish" about the value or benefits of SOCE or advocate for it does not render SB 1172 content-neutral. SB 1172 draws a line in the sand governing a therapy session and the moment that the mental health provider's speech "seek[s] to change an individual's sexual orientation," including a patient's behavior, gender expression, or sexual or romantic attractions or feelings toward individuals of the same sex, the mental health provider can no longer speak. Regardless of the breathing room SB 1172 may leave for speech about SOCE, when applied to SOCE performed through "talk therapy," SB 1172 will give rise to disciplinary action solely on the basis of what the mental health provider says or the message he or she conveys.

There is also little question that the Legislature enacted SB 1172 at least in part because it found that SOCE was harmful to minors and disagreed with the practice. For example, in SB 1172, the Legislature enacted findings and declarations based on the conclusions of numerous studies about the purported harmful effects and ineffectiveness of SOCE:

> The [American Psychological Association] task force concluded that sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people, including confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, increased self-hatred, hostility and blame toward parents, feelings of anger and betrayal, loss of friends and potential romantic partners, problems in sexual and emotional intimacy, sexual dysfunction, high-risk sexual behaviors, a feeling of being dehumanized and untrue

to self, a loss of faith, and a sense of having wasted time and resources.... The American Psychiatric Association published a position statement in March of 2000 in which it stated: "Psychotherapeutic modalities to convert or 'repair' homosexuality are based on developmental theories whose scientific validity is questionable." ... The National Association of Social Workers prepared a 1997 policy statement in which it stated: ... "No data demonstrates that reparative or conversion therapies are effective, and, in fact, they may be harmful." ... The American Academy of Child and Adolescent Psychiatry in 2012 published an article ... stating: "Clinicians should be aware that there is no evidence that sexual orientation can be altered through therapy, and that attempts to do so may be harmful." ... The Pan American Health Organization ... noted that reparative therapies "lack medical justification and represent a serious threat to the health and well-being of affected people."

SB 1172 (Findings & Decls. §§ 1(b), 1(d), 1(h), 1(k), 1(*l*)).[9] The Legislature's findings and declarations convey a consistent and unequivocal message that the Legislature found that SOCE is ineffective and harmful. Such findings bring SB 1172 within the content-based exception in *O'Brien* when intermediate scrutiny does not apply because "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." *O'Brien*, 391 U.S. at 382, 88 S.Ct. 1673; *see NAAP*, 228 F.3d

at 1055–56 (explaining that the challenged regulations were content-neutral because they were "not adopted because of any disagreement with psychoanalytical theories").

Especially with plaintiffs in this case, it is also difficult to conclude that just because SOCE utilizing speech is a type of treatment, that the treatment can be separated from a mental health provider's viewpoint or message. Duk has explained that the SOCE treatment he provides to his minor patients includes counseling. (Duk Decl. ¶ 6.) Duk is a Catholic and, with patients that share his faith, he discusses tenants of the Catholic faith, including that "homosexuality is not a natural variant of human sexuality, it is changeable, and it is not predominantly determined by genetics." (*Id.* ¶¶ 11–13.) Similarly, Welch has explained that he shares the views of his church that homosexual behavior is a sin and that SB 1172 will "disallow [his] clients from choosing to execute biblical truths as a foundation for their beliefs about their sexual orientation." (Welch Decl. ¶¶ 5, 8, Ex. 14.)

When a mental health provider's pursuit of SOCE is guided by the provider's or patient's views of homosexuality, it is difficult, if not impossible, to view the conduct of performing SOCE as anything but integrally intertwined with viewpoints, messages, and expression about homosexuality. Expert declarations defendants submitted in opposition to plaintiffs' motion are consistent with this conclusion. (*See* Haldeman Decl. ¶ 8 (Docket No. 40) ("A review of the literature relating to SOCE reflects that the premise underly-

---

**9.** The court is relying only on findings and declarations that the Legislature enacted in SB 1172, not statements in the legislative history or bill analyses. *Cf. O'Brien*, 391 U.S. at 383, 88 S.Ct. 1673 ("[The] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative

motive."); *see generally Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.2009) (explaining why, in the context of Free Exercise claims, whether a court can consider legislative history is an "unsettled" area of law).

ing treatments designed to change homosexual orientation is that homosexuality is a mental disorder that needs to be 'cured.' "); Beckstead Decl. ¶ 8 (Docket No. 36) ("A review of the literature in the field of [SOCE] reveals that the premise underlying SOCE is that homosexuality is a mental disorder, and that it is counter to some practitioners' religious and/or personal beliefs.").)

Although it does not appear that the Legislature intended to suppress the spectrum of messages that may be intertwined with SOCE, such as whether homosexuality is innate or immutable, its enacted finding "that [b]eing lesbian, gay, or bisexual is not a disease, disorder, illness, deficiency, or shortcoming" strongly suggests that the Legislature at least sought to suppress the performance of SOCE that contained a message contrary to this finding. SB 1172 (Findings & Decls. § 1(a)); *see Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). That messages about homosexuality can be inextricably intertwined with SOCE renders it likely that, along with SOCE treatment, SB 1172 bans a mental health provider from expressing his or her viewpoints about homosexuality as part of SOCE treatment. *Cf. City of Erie v. Pap's A.M.*, 529 U.S. 277, 293, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion) ("[T]here may be cases in which banning the means of expression so interferes with the message that it essentially bans the message.").

Against the backdrop of *NAAP*, *Conant*, and *Humanitarian Law Project*, this court would be hard-pressed to conclude that SB 1172 is content- and viewpoint-neutral. Accordingly, because it appears that SB 1172 lacks content and viewpoint neutrali-

ty, it is likely that it must ultimately be assessed under strict scrutiny.

### 2. *SB 1172 Is Unlikely to Withstand Strict Scrutiny*

If a statute "imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entm't Merchants Ass'n*, — U.S. —, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011). Strict scrutiny is a "demanding standard" and " '[i]t is rare that a regulation restricting speech because of its content will ever be permissible.' " *Id.* (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)).

To overcome strict scrutiny, "[t]he State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown*, 131 S.Ct. at 2738. The state's burden on strict scrutiny is substantial, especially when contrasted to the lowest level of review, which does "not require that the government's action actually advance its stated purposes, but merely look[s] to see whether the government *could* have had a legitimate reason for acting as it did." *Dittman v. California*, 191 F.3d 1020, 1031 (9th Cir.1999).

In *Brown*, the Supreme Court held that California's law banning the sale of violent video games to minors without parental consent did not pass strict scrutiny. The state recognized that it could not "show a direct causal link between violent video games and harm to minors," but argued that strict scrutiny could be satisfied based on the Legislature's "predictive judgment that such a link exists, based on competing psychological studies." *Brown*, 131 S.Ct.

at 2738–39. The Court rejected this argument, explaining that, under strict scrutiny, the state "bears the risk of uncertainty" and "ambiguous proof will not suffice." *Id.* at 2739. Although the state submitted studies of research psychologists "purport[ing] to show a connection between exposure to violent video games and harmful effects on children," the Court held that the studies did not satisfy strict scrutiny because the studies had "been rejected by every court to consider them" and did not "prove that violent video games *cause* minors to *act* aggressively." *Id.*[10]

The Court similarly criticized evidence of harm that the government submitted in support of a regulation that sought to prevent children from seeing "signal bleed" on sexually-oriented programming in *Playboy Entertainment Group, Inc.* In that case, the Court explained,

> There is little hard evidence of how widespread or how serious the problem of signal bleed is. Indeed, there is no proof as to how likely any child is to view a discernible explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound. To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another.

*Playboy Entm't Grp., Inc.*, 529 U.S. at 819, 120 S.Ct. 1878. The Court concluded that the "First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping" as the one at issue in the case. *Id.* at 819, 822–23, 120 S.Ct. 1878. It further emphasized that the government was required to present more than "anecdote and supposition" to prove an "actual problem." *Id.*

 In the findings and declarations of SB 1172, the California Legislature found that "California has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts." SB 1172 (Findings & Decls. § 1(n)). The court does not doubt that the state has a compelling interest in "protecting the physical and psychological well-being of minors." *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 946 (9th Cir.1997) ("The City's interest in protecting the safety and welfare of its minors is [ ] a compelling interest."). In its opposition brief, defendants also identified a compelling interest in "protecting all of society from harmful, risky, or unproven, medical health treatments." (Defs.' Opp'n

---

**10.** For the first time at oral argument, counsel for amicus cited three cases for the proposition that the court must defer to the Legislature's determination in matters of "uncertain science." The Supreme Court, however, does not appear to have been applying strict scrutiny in any of those cases. *See Gonzales v. Carhart*, 550 U.S. 124, 146, 161–64, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ("[W]e must determine whether the [challenged abortion] Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child," which was resolved, in part, by determining "whether the Act creates significant health risks for women"); *Kansas v. Hendricks*, 521 U.S. 346, 357–60, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding a civil commitment statute because it was not contrary to "our understanding of ordered liberty"); *Jones v. United States*, 463 U.S. 354, 364–66, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (holding that a civil commitment statute was not unconstitutional under the Due Process Clause because Congress's determination was not "unreasonable"). Amicus's argument is also inconsistent with *Brown*, which applied strict scrutiny, was decided after the three cited cases, and specifically rejected the state's argument that strict scrutiny could be satisfied based on the Legislature's "predictive judgment ... based on competing psychological studies." *Brown*, 131 S.Ct. at 2738–39.

at 28:14–15); *cf. NAAP,* 228 F.3d at 1054 ("Given the health and safety implications, California's interest in regulating mental health is even more compelling than a state's interest in regulating in-person solicitation by attorneys."); *see Nunez,* 114 F.3d at 947 (recognizing the "ostensible purposes of the ordinance identified by the City in its brief" when determining whether it demonstrated a compelling interest).

As the *Brown* Court explained, SB 1172 cannot withstand strict scrutiny unless the state demonstrates an " 'actual problem' in need of solving" and "a direct causal link" between SOCE and harm to minors. *Brown,* 131 S.Ct. at 2738–39. At most, however, defendants have shown that SOCE may cause harm to minors. For example in the 2009 APA Report, the APA states:

> We conclude that there is a dearth of scientifically sound research on the safety of SOCE. Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. Thus, we cannot conclude how likely it is that harm will occur from SOCE. However, studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts.

(2009 APA Report at 42.) The report further explains:

> A central issue in the debates regarding efforts to change same-sex sexual attractions concerns the risk of harm to people

that may result from attempts to change their sexual orientation. . . . Although the recent studies do not provide valid causal evidence of the efficacy of SOCE or of its harm, some recent studies document that there are people who perceive that they have been harmed through SOCE.

*(Id.* at 41–42; *see also* Herek Decl. ¶¶ 39, 45 ("[E]vidence exists that [SOCE] *may* cause harm ... [and] such interventions *may* be psychologically harmful in an unknown number of cases.") (emphasis added).)

Additionally, the studies discussed and criticized as incomplete in the 2009 APA Report do not appear to have focused on harms to minors, and the 2009 APA Report indicates that "[t]here is a lack of published research on SOCE among children." *(See* 2009 APA Report at 41–43, 72.) It is therefore unclear whether the reports of harm referenced in the 2009 APA Report were made exclusively by adults. In *Nunez,* the Ninth Circuit similarly criticized reliance on national statistics regarding a rising juvenile crime rate to demonstrate that a juvenile curfew was a narrowly tailored solution for a particular city. *Nunez,* 114 F.3d at 947.

In expert declarations defendants and amicus submitted, individuals opined that SOCE causes harm.[11] *(See* Beckstead Decl. ¶ 16; Haldeman Decl. ¶ 7; Ryan Decl. ¶ 21 (Docket No. 41).) None of the experts, however, identify or rely on comprehensive studies that adhere to scientific principles or address the inadequacies of the studies discussed in the 2009 APA Report. For example, Ryan's opinion primarily relies on analysis performed of "LGBT young adults, ages 21–25" and her

---

11. Plaintiffs submitted lengthy evidentiary objections to the declarations defendants and amicus submitted. *(See* Dockets Nos. 50, 51.) The court cites to these declarations only to demonstrate the insufficiency of the evidence defendants submitted and therefore need not resolve plaintiffs' evidentiary objections.

personal interviews with LGBT youth who underwent SOCE. (Ryan Decl. ¶¶ 14–16.) "Although the Constitution does not require the government to produce 'scientifically certain criteria of legislation,'" *Nunez*, 114 F.3d at 947 (quoting *Ginsberg v. New York*, 390 U.S. 629, 642–43, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)), the *Brown* Court rejected "research [ ] based on correlation, not evidence of causation" that "suffer[ed] from significant, admitted flaws in methodology," *Brown*, 131 S.Ct. at 2739 (internal quotation marks omitted). Here, evidence that SOCE "may" cause harm to minors based on questionable and scientifically incomplete studies that may not have included minors is unlikely to satisfy the demands of strict scrutiny.

The *Brown* Court was also concerned with the state's inability to prove that harm to minors was caused by video games as opposed to other sources of media. *See Brown*, 131 S.Ct. at 2739–40. Here, defendants face a similar inability to distinguish between harm caused by SOCE versus other factors. For example, in his declaration, Herek details the harms homosexual individuals experience as a result of societal stigmas, harassment and bullying, discrimination, and rejection.[12] (*See* Herek Decl. ¶¶ 18–21; *see also* Ryan Decl. ¶¶ 12–14, 20 (describing the harms that her research shows are caused by parents' and caregivers' "rejecting behaviors" to LGBT youth).) The few and arguably incomplete studies addressing harms of SOCE do not appear to have assessed whether the harms reported after undergoing SOCE were caused by SOCE as opposed to other internal or external factors and thus would have been sustained regardless of SOCE.

Lastly, the *Brown* Court also explained that, even when statutes pursue legitimate interests, "when they affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 131 S.Ct. at 2741–42. In *Brown*, the Court found California's legislation to be "seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental or avuncular veto." *Id.* at 2742. At the same time, "as a means of assisting concerned parents it is seriously overinclusive because it abridges the First Amendment rights of young people whose parents (and aunts and uncles) think violent video games are a harmless pastime." *Id.*

Here, SB 1172 prohibits only mental health providers from engaging in SOCE and, as defendants have pointed out, unlicensed individuals who do not qualify as "mental health providers" under the bill can engage in SOCE. If SOCE is harmful and ineffective, the harm minors will endure at the hands of unlicensed individuals performing SOCE is equal, if not greater, than the harm they would endure from mental health providers performing SOCE. In fact, the California Legislature has previously "recognized the actual and potential consumer harm that can result from the unlicensed, unqualified or incompetent practice of psychology." *NAAP*, 228 F.3d at 1047. The limited scope of SB 1172 therefore suggests that it is likely underinclusive in its application only to mental health providers.

---

**12.** In its findings and declarations, it appears that the California Legislature sought to help end some of that stigma, finding, "Being lesbian, gay, or bisexual is not a disease, disorder, illness, deficiency, or shortcoming." No matter how worthy this effort may be, it cannot override First Amendment protections.

*Cf. Brown*, 131 S.Ct. at 2739 n. 8 ("But there are all sorts of 'problems'—some of them surely more serious than this one—that cannot be addressed by governmental restriction of free expression: for example, the problem of encouraging anti-Semitism.").

The Ninth Circuit has observed that regulations subject to strict scrutiny "almost always violate the First Amendment." *DISH Network Corp. v. FCC,* 653 F.3d 771, 778 (9th Cir.2011). In light of the heavy burden strict scrutiny imposes on defendants, the lack of evidence demonstrating "actual harm" and a causal relationship between SOCE and harm to minors, and the underinclusiveness of SB 1172, the court finds at this preliminary stage that SB 1172 is not likely to withstand strict scrutiny. Accordingly, because it appears that SB 1172 is content- and viewpoint-based and unlikely to withstand strict scrutiny, plaintiffs have established that they are likely to prevail on the merits of their claim that SB 1172 violates their rights to freedom of speech under the First Amendment.

C. *Remaining Preliminary Injunction Considerations*

■ The Ninth Circuit "and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente,* 584 F.3d 1196, 1207–08 (9th Cir.2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Plaintiffs have therefore shown that they are likely to suffer irreparable harm in the absence of an injunction.

■ In determining whether plaintiffs have shown that the balance of equities tips in their favor, "the district court has a 'duty ... to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky,* 586

F.3d 1109, 1138 (9th Cir.2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1203 (9th Cir.1980)). Having proven that they are likely to succeed on their First Amendment free speech challenge to SB 1172, the most significant hardship to Welch and Duk is that SB 1172 will likely infringe on their First Amendment rights because it will restrict them from engaging in SOCE with their minor patients. Any harm to Bitzer is more remote and less significant because he is not currently a "mental health provider" and thus his speech would not be governed by SB 1172. Although he has explained that SB 1172 would require him to change his career plans, even if SB 1172 is not enjoined, he could engage in SOCE with the various religious groups he has described because SB 1172 would not extend to him.

If defendants are enjoined from enforcing SB 1172 against plaintiffs, a law that the California Legislature enacted would be, at least until this case is resolved on the merits, unenforceable as against these three plaintiffs.[13] The Supreme Court has recognized that, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* — U.S. —, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) (internal quotation marks and citation omitted). The state also has an interest in protecting the health and welfare of minor children, and the Legislature found that SOCE causes harm to minor children. *Cf. Brown,* 131 S.Ct. at 2736 ("No doubt a State possesses legitimate power to protect children from harm, but that does not

---

13. A preliminary injunction in this case would be limited to plaintiffs. *See generally Zepeda v. INS,* 753 F.2d 719, 727–28 (9th Cir.1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it

may not attempt to determine the rights of persons not before the court.... The district court must, therefore, tailor the injunction to affect only those persons over which it has power.").

include a free-floating power to restrict the ideas to which children may be exposed.") (internal citation omitted).

The harm to the state in being unable to enforce SB 1172 against plaintiffs is not as substantial as it may initially appear. California has arguably survived 150 years without this law and it would be a stretch of reason to conclude that it would suffer significant harm having to wait a few more months to know whether the law is enforceable as against the three plaintiffs in this case. When balanced against the risk of infringing on plaintiffs' First Amendment rights, forcing the state to preserve the long-standing status quo so that the case can be resolved on the merits and through the appellate process confirms that any harm the state faces is de minimis.

 The final consideration in determining whether to grant a preliminary injunction is the public interest. Although the Ninth Circuit has "at times subsumed this inquiry into the balancing of the hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected." *Sammartano v. First Judicial Dist. Ct., in & for Cnty. of Carson*, 303 F.3d 959, 974 (9th Cir.2002) (internal citation omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties" and "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Id.; see, e.g., Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression."). "The public interest in maintaining a free exchange of ideas, though great, has in some cases been found to be overcome by a strong showing

of other competing public interests, especially where the First Amendment activities of the public are only limited, rather than entirely eliminated." *Sammartano*, 303 F.3d at 974.

 Here, the public has an interest in the protection and mental well-being of minors, and the court does not take lightly the possible harm SOCE may cause minors, especially when forced on minors who did not choose to undergo SOCE. *See Stormans, Inc.*, 586 F.3d at 1139 ("The 'general public has an interest in the health' of state residents."). Countered against this is the public's interest in preserving First Amendment rights. Given the limited scope and duration of a preliminary injunction in this case, the court has no difficulty in concluding that protecting an individual's First Amendment rights outweighs the public's interest in rushing to enforce an unprecedented law.

That public perception in favor of this law may be heightened because "it appears that homosexuality has gained greater societal acceptance ... is scarcely an argument for denying First Amendment protection to those who refuse to accept these views. The First Amendment protects expression, be it of the popular variety or not." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Accordingly, because plaintiffs have made an adequate showing under each of the four factors discussed in *Winter*, the court will grant their motion for a preliminary injunction.

IT IS THEREFORE ORDERED that plaintiffs' motion for a preliminary injunction be, and the same hereby is, GRANTED. Pending final resolution of this action, defendants are hereby enjoined from enforcing the provisions of SB 1172 (to be codified at Cal. Bus. & Prof.Code §§ 865–

865.2) as against plaintiffs Donald Welch, Anthony Duk, and Aaron Bitzer.